1817.29 Good morning. May it please the court, Gary Yerman on behalf of Petitioner. The Board has recognized in decisions having presidential authority the concept that what has happened to persons similarly situated has a bearing on the claim made by an asylum seeker, a matter of Moghrabi, stating that where the country at issue has a history of persecuting people in circumstances similar to those of the asylum seeker, careful consideration should be given to that fact. This Court has the authority, and I would ask it, to take judicial notice of the 2017 State Department International Freedom Report. A few excerpts, what I believe are the most damaging, are as follows on page 6. While the current regulations stipulate the obligations of religious groups to abide by the law and safeguard national unity, and you cited I'm concerned that to have you focus on Mr. Fu's circumstance and the errors in the BIA's decision, we can read the report. I'm happy to look at it closely, but I think you might be better served by telling us why substantial evidence doesn't support the BIA's determination. This was a difficult circumstance here, but your client seems to have gone to church irregularly since he arrived in the United States. He was not baptized. The agency found that there was an inadequate basis for thinking that he actually would become a regular churchgoer were he to be returned to China, and especially to the province that he was in, and that the his father had been persecuted was inadequate to suggest that the authorities would become aware of his own somewhat irregular or inconsistent practice of religion. And it's we need to determine whether for what reason substantial evidence didn't support that conclusion or that a reasonable fact finder would be compelled to find otherwise, especially, I mean, you've got a somewhat favorable credibility finding here. And so I'd like to hear your view about that evidence in particular, about whether it was speculative that he would be a churchgoer or not. We can take notice of various matters in the report, such as the 70 million Christians in China and the variability of the Chinese government's adverse actions towards practicing Christians. And it seemed that in Jilin Province, where his father was persecuted, that maybe that's a basis for finding that he would be were it to come to people's attention there. But I really would like you to focus on his particulars here, if you would. Okay, Your Honor. Let's start with the fact that the immigration judge found my client to be credible, and that the BIA agreed with that finding and did not disrupt it. So we start with the fact that he's credible, and then we go to his testimony. Now, if we go to the record, pages 63 through 67, that's the part of the testimony that I would like the Court to focus on, because it's that part of his testimony where he says, now that I'm not working on Sundays, I'm able to go to church on a regular, consistent basis. He started that only in the four or five weeks right before his hearing, before the immigration judge. He had not gone to church on Easter. He didn't know when Easter was. He said he just forgot. It wasn't that he was working. And he went to church. He attended church, I think, a total of maybe 12 times, something like that. It was a little hard to tell from the record, the transcript, out of the 234 weeks he had been in the United States. I was, you know, I was troubled by that. There were long, long gaps. And I understand the Court's concern with those problems and those gaps. But I would assert to the Court that this is the reality of immigrant life. This young man came here at the age of 19, and he thought he was an adult, so he should be on his own taking care of himself. So he worked and went to school. And when he had time, he went to church. And he stated that. There's no requesting a day off if you're an immigrant. There's no asking a friend or a father to take a day off from work if you're an immigrant. And his father was working, was living across the country, so we would assert that he was not reasonably available. So we look at my client's testimony. And his testimony is that I came here, I was introduced to Christianity, I delved in it a little bit, then I lost my ability to go there, but now I'm back. And I believe that this is something I want to continue doing, and this is in the record, something I want to participate in, something if you send me to China, I will continue to participate in. So that's the reality of this young man's situation. And I would assert that that's maybe even more plausible than somebody who comes here and all of a sudden goes to church every day for six months, and then says, I'm a Christian. Well, okay, but just because you went to church every day for six months doesn't make you a Christian. And what's more important... Are you saying that the... Oh, go ahead. What's more important is what the Chinese government perceives my client's intentions are. Not the amount of knowledge and amount of time that he will be going to church. Is he a practicing Christian? Is he disrupting the communist superiority theory of government? Well, the disruption would only be, theoretically, if he was attending an underground church and the Chinese government might be concerned about that chiefly if he was a leader of an underground church. And indeed, there may be provinces in which they don't care about it. So it's hard to see why, if he can't be in Jilin province, why he has to be in Brooklyn. Well, Your Honor, that's a valid question. And that's why I wanted to start out my argument here with pointing out what the 2017 international report says. Because this court, this bench, has decided, between the two, between the bench, has decided 57 religious future fear cases. And in all your decisions, unprecedented decisions, you've denied the claim. Except for one that Judge Jacobs, you remanded for a procedural reason. In those decisions, you cite religious leaders and clergy as the ones who are being the focus of attention. Now, I point to the 2017 where words matter. And they've changed the words from religious leaders and clergy to adherence, Judge. That report, which is not in the record, but look, it's there. But it doesn't state any material change in the treatment of underground Christians. Well, I would respectfully disagree, Your Honor. It lists adherence, consistently listing adherence as the people who are being sent to detainment camps, who are being abused, who are being beaten. On August 22nd, the government-backed groups beat five or six of the church members. Attackers dumped buckets of mud on the Christians, shot firecrackers at them, and beat one woman unconscious. One of the attackers reportedly told the church members, quote, beating people up is my job, end quote. Local police reportedly refused to intervene to stop the attackers. The report also identifies that there are about 70 million adherents to Christianity in China. I'm glad you brought that up, Your Honor. I will reverse the question and ask the Court. If I told you that 4 percent of the population was conducting a certain amount of a certain kind of activity, would that indicate to this Court that that activity is free from interference because 4 percent of the population was active in that activity? And that's what the number is. When you have 1.3 billion people, 70 million equals 4 percent. When you say that activity, you mean Christian worship. Christian worship. But the issue here is whether your client has demonstrated a likelihood that he would attend an underground church, which only a small percentage, presumably, of that, of those 70 million do. And look, it's not for me to say how often he ought to go to church or whether he should go to church on Easter or whether he has other things that he has to do in order to keep body and soul together. But considering that he doesn't attend church all that much, what is there that compels a conclusion that his piety and orthodoxy is such that he would attend an underground church? He had the opportunity to fudge his church attendance, to exaggerate his church attendance, and he didn't. Yes. He's believable. That's the finding that was made. And so if he's believable, we have to look at the record where he says, I will continue to attend churches if you send me back to China and government-sponsored churches will not satisfy my religious needs. Well, he may be truthful in a statement of a resolution. I'm going to attend church. I'm going to stop smoking. I'm going to read Anna Karenina. But you can be truthful about these things and yet not actually do them. I agree. I agree, Judge. But we have to look at these facts. And this man says that he will continue to attend church if sent back to China. His father was persecuted, spent two weeks in jail solely because he was a Christian member. And the government does have an extra set of eyes on this household. And that's why under Cardozo-Fonseca, there is a reasonable possibility that's not purely speculative that he will be harmed as a result of his religious practice. When was the last time the authorities visited his mother? Years ago. And what is the status of his father's removal proceedings in Los Angeles? Pending. Still pending? Yes, Your Honor. Thank you. Thank you. We'll hear from the government. You have no rebuttal, I guess. Thank you. Good morning. Brendan Hogan for the government. May it please the Court. Regarding the father's status, he has a hearing scheduled for October 2020 on the merits. His case hasn't been adjudicated. A year from now. Okay. Thank you. In the present case, the review petition should be denied. Substantial evidence supports the agency's determination. First, with regards to credibility, while that is true, the agency found that that only satisfies the subjective prong for establishing a viable asylum claim. Unfortunately for the petitioner in this case, he submitted no objective evidence whatsoever that he'll be singled out for harm in his home country. So let me ask you about that. You know, he was found credible. He's not been here all that long and his church attendance has increased and become, it appears, more regular. His father was not disputed, I think, by the government. His father was persecuted in his home province for attending an underground church and for his practice of Christianity and was detained and beaten for two weeks. And that authorities had visited his mother. And so the family is kind of on the radar screen of authorities. And this also suggests that in Jilin province that there's active authoritarianism with regard to church goers. So some of the concerns about awareness of the authorities and locality practices seem to be addressed by the record of the persecution of his father. And given the credibility finding that it was his intention, so not only is it his subjective fear, but there's an objective basis for a fear were he to continue to go to underground churches in his home province. Why isn't that enough? Why doesn't that compel a different conclusion than the agency reached? Because, Your Honor, with the weight of the evidence assigned by the fact finder in this in the record regarding the harm to a practicing Christian in Jilin province from pages of Is it questioned by the government? That at some point he was detained in 2007, Your Honor, but between 2009 and 2013, the police came to their house two times and just said, where is your husband? Where is your father? And they left the family alone. They haven't been back to that. He admitted that since 2013, the police have not contacted his family whatsoever for any reason. But that still suggests to me that the family is on the government's radar screen. It's been almost a decade, Your Honor, since they've contacted the family. And again, they only contacted the family in the context of where is the petitioner's father. They have no awareness the petitioner is a nominal Christian. And he hasn't pointed out how they would find out that upon his return. And again, that goes back to the weight of the evidence, which is limited to five articles between pages 134 to 151, which do not mention his home province whatsoever. It mentions incidents in other provinces, which shows that enforcement varies by the government. And most importantly, at page 141 and 148, in certain provinces, the authorities are hands off. You can go to underground church and they don't bother people. Yes, but here they did bother the father, it appears. But again, that goes to there's 70 million Christians in China, Your Honor, and he points to one incident 14 years ago. So let me let me ask about corroborating evidence. The IJ seemed swayed and the BIA seemed swayed by the absence of a letter from the mother, a letter from the father or so on. But in my experience, when we see such letters, they're either dismissed as of an uninterested party, they're inadequately authenticated, and it can be they're really of no particular help. And it didn't seem to me that the IJ was very specific in his request for corroborating evidence. Could you speak to what the requirement is? Well, here, Your Honor, again, the only evidence whatsoever was the five news articles. There was nothing else. They asked him, the first church he went to, what was the name of it? He couldn't recall it. Do you have letters or statements or testimony from people who went to church with you there? No. The second church, the same. He couldn't. It was the Korean church. Yes, the first one. That he went to initially. I believe in Bayside? Bayside. Then there was the second church where he went for one month in 2015. Again, he couldn't provide the names of anyone. He went to St. Ferdinand Baptist and he, well, he described the church. He described the building, but he couldn't remember anything else about it. And then there was the third church where he admitted they wouldn't write a letter on his behalf because he had such a nominal or such little contact with the congregation. Only a month. No congregants. He hadn't asked any of his fellow practitioners to come vouch for him. He would testify or write a letter. He's never been baptized. But again, the I.J. found that he was credible. The I.J. didn't dismiss, but seemed to take. Those are signs that any finding that he would attend church in China would be speculative more. Isn't that right? Not just that, Your Honor, but again, with the weight of the evidence in this case, there's 70 million Christians in China and he has to show why he specifically is going to be singled out as opposed to all those other people. And given the variation in enforcement from province to province, pointing to one incident among 70 million people is just simply not enough to satisfy his burden of proof. And again, I understand why the panel might have concerns in this case, but the standard is would a reasonable fact finder, could no reasonable fact finder have reached a decision in the immigration judge? And reasonable minds can disagree, but that doesn't mean the immigration judge was wrong, Your Honor. There was no corroboration. On the other hand, no corroboration was needed for the I.J. to make a finding that he was credible. So if somebody's credible, why do they need corroboration? Because that only is enough to satisfy the subjective prong, Your Honor. He has to show an objectively reasonable fear. I mean, this court has held that in numerous cases. It seemed to me that it could have been objectively reasonable based on the credibility finding, his own statement that he would attend church if returned, the visits of the authorities to his home, the prior persecution of his father, which was not discredited, and so awareness, the authorities' awareness and past practice. Right, but again, Your Honor, he would have to show that he specifically is going to be singled out for harm, and he hasn't done that. No one in China is aware of what he's done in this country except for perhaps his mother. But he didn't even talk about if he had discussed his religious practices or beliefs with her. He talks to her about every two weeks, he said, and really, she hasn't said anything about the authorities contacting the family. And to put a fine... Do you think it objectively unlikely that if he were to return to his home where his father was persecuted for his faith that the authorities would... I think the fact finder in this case made a reasonable determination, Your Honor, that a reasonable fact finder could reach the conclusion in this case, and that's what the agency determined, and therefore it's supported by substantial evidence. And the government cited numerous unpublished orders by this court in its brief, and just to put a fine point on it, in those cases it seemed that those petitioners had much stronger cases than the petitioner in this case, and yet the court still held that substantial evidence supported the agency's determination. And what's the government's position on whether we can take into consideration statements made in the 2017 State Department report? With regards to judicial notice, Your Honor, there's no reason to do that. It doesn't really show materially changed circumstances. I believe the case on point is Hoholare. I'm not saying that correctly, I apologize. But even if it did, the excerpts cited by Petitioner's Counsel don't mention Jilin Province and really don't discuss rank-and-file practices. Speaking more generally, can we take notice of it? It's discretionary. Your view is it favors you. So, can we take notice of it? It is in the court's discretion, Your Honor. But again, as the government said... It's an official publication of the State Department. As the government said in its brief, Your Honor, the proper mechanism, if Petitioner believes that is helpful to his case and shows materially changed conditions, would be to file a motion to reopen. And as of a week ago, the board confirmed that no motion to reopen had been filed. All right. Thank you very much. We'll take the matter under advisement.